# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF GEORGIA

# STATESBORO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| v. | ) | Case No. CR609-027 |
| | ) | |
| ALPHONZO GAFFNEY GLENN, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

Alphonzo Glenn, along with some forty to fifty other people, was a patron of the What Game Room in Reidsville, Georgia when police officers arrived to execute a search warrant that they believed authorized them to search the premises for distilled spirits being sold by the proprietor without a license. The search warrant was utterly defective, however, for it described neither the place to be searched nor the items to be seized. On the strength of this facially invalid warrant, a squad of officers and SWAT team members burst into the crowded and dimly lit premises, ordered everyone to the floor, and proceeded to patdown each of the patrons for weapons and contraband, a procedure that took over

an hour to complete. Glenn now moves to suppress the small caliber pistol that was removed from his waistband, as well as the statements that he made to the officers following the discovery of that weapon. (Doc. 19.) His motion should be GRANTED.

## FACTS

In January 2009 the What Game Room -- essentially a pool hall and bar -- opened for business in the small rural town of Reidsville, Georgia, across the street from a public housing complex. Soon thereafter Reidsville police officers received complaints of occasional fights, disorderly conduct, and drug sales at the establishment. Using a confidential informant, they made several controlled purchases of cocaine and marijuana from certain patrons of the game room. Surveillance established that some members of a local gang known as the Red Hot Georgia Pimps frequented the premises and sometimes sold drugs there. The officers further determined that the proprietor of the establishment was selling distilled spirits without a license, a misdemeanor offense under Georgia law. Using their informant, the officers made several controlled purchases of Seagram's gin from the

proprietor. They then elected to apply for a warrant to search the game room and seize the distilled spirits kept on the premises.

Lt. James Waters, a six-year veteran of the Reidsville police department, prepared an application and affidavit for a search warrant, which he presented to a local magistrate on February 20, 2009.[1] This two-page document described the What Game Room and its location in great detail and indicated the officer's belief that evidence of a crime -- specifically "distilled spirits" -- could be found on the premises. The affidavit related that Lt. Waters and Sgt. Kirkland had utilized a confidential informant to make four controlled purchases of distilled spirits from the game room's proprietor, who lacked a liquor license. Each sale involved a half-pint of liquor which the proprietor sold to the informant for the sum of $5.00. The proprietor poured the gin into the half-pint bottles from a half-gallon bottle that he kept behind the bar. The affidavit also contained this brief sentence: "The CI also advised that there are often narcotics and firearms in the building." (*Id.*, ex. B.)

---

[1] Although Waters had served as a police officer for some nine years and reported in his affidavit that he had received 900 hundred hours of police training, he testified that this was the first time that he had ever personally applied for a search warrant. Indeed, while he had helped execute search warrants in the past, he had never even read a search warrant or warrant application in his police career.

No effort was made to flesh out this statement, and the application and affidavit did not seek authority to conduct a search for any such items.

A Tattnall County Magistrate Court judge signed the search warrant that Lt. Waters presented along with his application and affidavit. That warrant is remarkable for its deficiencies: It does not describe the place to be searched, the items to be seized, or the law being violated, although the warrant contained blank spaces for inserting such information.[2] Indeed, the only information reflected on this "warrant" is the name of the affiant (which was handwritten by Lt. Waters at the top of the warrant) and the date and judge's signature (which appear at the bottom of the warrant).

Equipped with this essentially blank warrant, Lt. Waters and Sgt. Kirkland assembled a team of some fifteen officers, including the Tattnall County SWAT team, in preparation for entering and searching the What Game Room. The warrant, which was issued on a Friday,[3]

---

[2] The warrant form instructs the preparer to "state [a] detailed description of person, property, or location," "specify evidence, contraband or person (s) to be searched for," and "name the law being violated." (Doc. 19, ex. A.)

[3] The exact time that warrant was signed was not indicated by the issuing magistrate, despite a Georgia statute requiring that "[a]ll warrants shall state the time and date of issuance. . . ." O.C.G.A § 17-5-2.

permitted the officers to conduct their search within ten days of February 20, 2009. The officers, however, decided to execute the warrant later that same day, when they knew the game room would be filled with customers. During a pre-search briefing, Lt. Waters directed the entry team "to put everybody in the establishment on the ground" and frisk each person -- whether owner, employee, or patron -- for possible weapons and drugs.[4]

The assembled entry team arrived at the What Game Room and stormed into the premises at around 10:00 p.m. There were some forty to fifty patrons present at that time. Upon entering, the officers yelled "get on the ground" and promptly turned on the lights. Everyone in the establishment instantly complied with the officers' commands to go to the floor. Members of the entry team then proceeded to patdown each patron as they lay prone on the floor. Because of the large number of patrons (and the fact that a female officer had to be called to the scene to frisk the female patrons), the frisking process took approximately an hour.

---

[4] Lt. Waters described this show of force and patdown procedure as a standard technique used during virtually all search warrant executions by the Reidsville police.

During his frisk of defendant Glenn, Officer Nathan Waters (no relation to Lt. Waters) removed a .22 caliber pistol from Glenn's waistband.[5] Officers placed Glenn under arrest after determining that he had a felony record. No other weapons or contraband of any kind was found on any of the other numerous patrons present that night. At some point, officers did locate and seize some distilled spirits from the proprietor, as well as some Pabst Blue Ribbon beer[6] that the proprietor had no license to distribute.

## ANALYSIS

Defendant Glenn seeks to suppress the pistol seized from his waistband and his later statements to the officers concerning that pistol.

---

[5] Waters testified that before proceeding with the frisk he asked if Glenn had anything on his person that the officers needed to know about and if he "mind[ed]" a frisk of his pockets. (Tr. at 47.) Glenn acknowledged that he had a gun in his waistband. The government has not asserted that Glenn voluntarily consented to a patdown search, much less met its burden of proving that any consent "was freely and voluntarily given, a burden that is not satisfied by showing a mere submission to a claim of lawful authority." *Florida v. Royer*, 460 U.S. 491, 497 (1983). Given (1) that the officers had determined to frisk everyone they encountered, (2) the forceful and dramatic nature of their entry into the premises, and (3) the ongoing patdown searches of other patrons in Glenn's near vicinity, the Court is satisfied that Glenn interpreted the officer's statements as mere politeness rather than a true request for consent to search his person. And as will be seen, any "consent" not contaminated by duress or coercion was tainted by the initial illegality occasioned by defendant's wrongful seizure.

[6] Although the proprietor evidently had a wine and beer license, he did not have specific authority to distribute this particular beer.

(Doc. 19.)  He contends that the officers acted improperly when they performed a "generalized search" of his person without any reasonable or articulable suspicion that he posed a threat to officer safety.  (*Id.* at 2-3.)

## A.  The Search Warrant was Invalid[7]

The government acknowledges, as it must, that the search warrant executed by the Reidsville police failed to particularize the place to be searched or the things to be seized.  The government insists, however,

---

[7] At the suppression hearing the Court suggested that since defendant had no legitimate expectation privacy in the What Game Room, he lacked "standing" to assert that the search was deficient.  Upon further reflection, the Court believes that it was too hasty in dismissing the significance of the flawed search warrant in analyzing the legality of the officers' seizure and search of defendant.  As will be developed below, the only reason the government has offered for the initial seizure of defendant and the other patrons (by ordering them to the ground) was the need to secure the premises prior to the execution of a valid search warrant.  The Court will assume for present purposes that the Fourth Amendment allows officers charged with executing such a premises warrant in a darkened bar or pool room to "routinely exercise unquestioned command of the situation" by briefly seizing all persons present. *Michigan v. Summers*, 452 U.S. 692, 702-03 (1981).  But such brief seizures under *Summers* and its progeny (which are justified by legitimate law enforcement safety and investigative interests) must be premised upon the existence of a *valid* warrant.  *Id.* at 702, 703 (holding that police may routinely detain the occupants of premises being searched for contraband pursuant to a "valid warrant").  Conversely, officers armed with a facially *invalid* warrant have no right to conduct any search whatsoever pursuant to that document, much less seize every customer present pursuant to the standardized procedure contemplated by *Summers*.  So, the validity of the search warrant has a bearing on the lawfulness of the officers' initial seizure of everyone present in the What Game Room.  Moreover, even if this were not the case, the Court would feel compelled to comment on the officers' reliance upon a warrant so fundamentally flawed as the one presented here.

that the warrant was nevertheless "legally sufficient" because Lt. Waters had included a detailed description of the What Game Room and the distilled spirits that he sought to seize in the affidavit and application that he presented to the issuing magistrate in support of the warrant. (Doc. 25.) The government further contends that even if the warrant is determined to be insufficient, this is an appropriate case for the application of the "good faith doctrine." (*Id.* at 2-3.) Both of these arguments have clearly been rejected by the Supreme Court of the United States.

In *Groh v. Ramirez*, 540 U.S. 551 (2004), the Supreme Court considered the validity of a search warrant that particularly described the place to be searched but neglected to provide any description of the items to be seized. The Court held that the search warrant "was plainly invalid," *id.* at 557, for it violated the unambiguous command of the Fourth Amendment that "no Warrants shall issue" except those "particularly describing the place to be searched, and the persons or things to be seized." U.S. CONST. amend IV. A search conducted pursuant to such a facially invalid warrant is clearly "unreasonable" under the Constitution. *Id.* at 563. The Court then rejected the very

argument the government is asserting here: "The fact that the *application* adequately described the "things to be seized" does not save the *warrant* from its facial invalidity. The Fourth Amendment by its terms requires particularity in the warrant, not in the supporting documents." *Groh*, 540 U.S. at 557. While the Fourth Amendment does not prohibit a warrant from cross-referencing a supporting application or affidavit, the warrant must use "appropriate words of incorporation" and the supporting document must accompany the warrant. *Id.* at 557-58.

The *Groh* Court emphasized that a warrant that fails to "describe the items to be seized *at all* . . . [is] so obviously deficient that we must regard the search as 'warrantless' within the meaning of our case law." *Id.* at 558. Further, the Court expressly rejected the argument that the executing officer is entitled to rely in good faith upon an unparticularized warrant issued by a magistrate, for it is not reasonable for an officer to rely upon a warrant that is "so patently defective." *Id.* at 561 n.4. It is the duty of the officer executing a search warrant to ensure that warrant satisfies the Fourth Amendment particularity requirement. *Id.* at 563. "Given that the particularity requirement is set forth in the text of the

Constitution, no reasonable officer could believe that a warrant that plainly did not comply with that requirement was valid." *Id*.

The search warrant at issue in this case is far more glaringly deficient that the warrant considered in *Groh*, for it utterly fails to describe either the items to be seized or the place to be searched. The warrant executed by the Reidsville police, therefore, was "plainly invalid" and any search conducted pursuant to the facially deficient warrant was unreasonable under the Constitution. *Id*. at 563. The warrant is not rehabilitated by the fact that Lt. Waters described the place to be searched and items to be seized in the supporting documents he presented to the magistrate, for the warrant nowhere references his application and affidavit, and Waters conceded at the suppression hearing that the supporting documents did not accompany the warrant.

The officers in this case conducted a warrantless -- and therefore presumptively unreasonable -- search of the What Game Room on February 20, 2009. *Id*. at 559 (noting that such warrantless searches are "presumptively unreasonable"). Since the warrant relied upon by these officers was no warrant at all, they had no right to seize defendant or any of the game room's patrons while they prepared to execute that

worthless document. The officers acted entirely improperly, therefore, in asserting their authority over everyone in the establishment, ordering defendant and the other patrons to the ground, and systematically "frisking" everyone who was present. (The government has not argued that the officers had any basis for conducting a warrantless search of the game room that night.)

The government's contention that the initial seizure and subsequent patdown of defendant met constitutional standards rests upon the flawed assumption that the officers were executing a valid search warrant. *Groh* clearly establishes that they were doing no such thing. As the search warrant was patently invalid, and as the good faith doctrine does not apply in this context, all of the officers' actions that evening were "unreasonable" within the meaning of the Fourth Amendment.

### B.  The "Frisk" was Unconstitutional

Even assuming that the officers were executing a valid warrant (and therefore had the right to briefly seize all persons present in the What Game Room while they secured the premises), the systematic

patdown search of everyone present in the establishment was not warranted on these facts.

The controlling case is *Ybarra v. Illinois*, 444 U.S. 85 (1979), which considered (and set limits upon) police authority to search or frisk persons who happen to be present at the time of the execution of a *valid*[8] search warrant. Like this case, *Ybarra* involved a warrant search of commercial premises (a tavern and the tavern's bartender) where customers were present at the time of the search. Armed with a warrant authorizing a search for evidence of possession and distribution of heroin by the bartender, seven or eight officers entered the tavern, announced their purpose, and proceeded to patdown each of the nine to thirteen customers present at the time. *Id*. at 88. The initial frisk of Ybarra revealed a cigarette pack with objects in it. A second frisk established that the objects were six small packets of heroin.

The Supreme Court first noted that there was no *probable cause* to search anyone but the bartender, for the search warrant affidavit did not

---

[8] Both the majority and the dissent in *Ybarra* focused on "the proper scope of a policeman's power to search pursuant to a *valid* warrant." 444 U.S. at 99 (Rehnquist, J., dissenting) (emphasis added). While *Ybarra* did not address the scope of an officer's power to search when executing a warrant later determined to be invalid, it seems clear that the constraints imposed by *Ybarra* would apply with special force in such a situation.

even mention the tavern's patrons, and the officers executing the warrant had no reason to believe Ybarra was engaged in any criminal wrongdoing. In an oft-quoted passage, the Court observed that "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person." *Id.* at 91. Instead, an evidentiary search of a person "must be supported by probable cause *particularized with respect to that person.*" *Id.* (emphasis added).[9] As in *Ybarra*, the officers in this case had no authority whatsoever to conduct an evidentiary search of defendant Glenn, for he was not referenced in the search warrant affidavit and the officers had no reason to believe that he had committed or was committing a crime when they encountered him upon their entry.

The Supreme Court next considered the precise argument asserted by the government here: that the "patdown search" of the patrons "constituted a reasonable frisk for weapons under the doctrine of *Terry v. Ohio*, 392 U.S. 1." *Ybarra*, 444 U.S. at 92. The government contends

---

[9] Here, the government does not assert that there was any probable cause basis for searching defendant Glenn or any of the other patrons of the What Game Room. Further, the government argues that the probable cause standard is inapplicable, for it continually insists that the officers were conducting a "frisk" for weapons not a "search" for contraband or other evidence. The Court will have more to say about the officers' true intent later in this Report.

13

that such a frisk was warranted because the dimly lit game room was crowded with customers, local gang members frequented the premises and sometimes sold drugs there, and the police informant had reported seeing weapons in possession of both the proprietors and some patrons during prior visits to the establishment. In other words, the government argues that even though the police did not have any specific reason to suspect that defendant Glenn was armed and dangerous, their generalized suspicion that weapons might be present in the game room justified a patdown search of the four dozen or so patrons, including Glenn. This argument cannot withstand scrutiny under *Ybarra*.

*Ybarra* held that a frisk (or "patdown search") of a person who happens to be present during the execution of a search warrant must be "supported by a reasonable belief that he [is] armed and presently dangerous, a belief which this Court has invariably held must form the predicate to a patdown of a person for weapons." 444 U.S. at 92-93. Just as an evidentiary search of a person based upon probable cause "must be particularized with respect to that person," *id.* at 91, a *Terry* protective frisk also requires a focused, individualized assessment of the danger posed by the particular person sought to be frisked:

> Nothing in *Terry* can be understood to allow a generalized "cursory search for weapons" or indeed, any search whatever for anything but weapons. The "narrow scope" of the *Terry* exception does not permit a frisk for weapons on less than reasonable belief or suspicion *directed at the person to be frisked*, even though that person happens to be on premises where an authorized narcotics search is taking place.

*Ybarra*, 444 U.S. at 93-94 (emphasis added).

In *Ybarra*, the police were unable to articulate any "specific fact" that would have justified the on-scene determination that Ybarra was himself "armed and dangerous." *Id*. at 93. His mere presence in a small bar where heroin was being possessed and distributed (and for which the officers had a valid search warrant) was alone insufficient to justify such a frisk. Since Ybarra "gave no indication of possessing a weapon" and acted in a non-threatening manner, the police had no basis for frisking him. *Id*.

Even assuming that the officers in this case were executing a valid warrant, and accepting for the moment the government's argument that these officers were doing nothing more than conducting a protective frisk for weapons (rather than a generalized search for evidence), the officers' conduct cannot survive the holding of *Ybarra*. It is undisputed that police officers executing a search warrant have the right to "routinely

exercise unquestioned command of the situation." *Summers*, 452 U.S. at 702-03. The police did that here when they rushed into the game room with a phalanx of armed and intimidating SWAT officers, ordered everyone to get down, turned on the lights, and secured the premises before commencing their search for contraband liquor. But while such a show of force and consequent seizure of everyone present may have been appropriate that evening (again, assuming a valid warrant), the further intrusion of systematically conducting patdown searches of the forty to fifty patrons of the game room certainly was not appropriate. Even though the police had reason to believe that on some earlier occasions (when, we don't know) some patrons (how many, we don't know) had possessed weapons,[10] that knowledge did not furnish a reasonable belief that *each* patron that night was armed and dangerous. *Ybarra,* like *Terry,* allows a protective patdown for weapons only where the police reasonably believe or suspect that the particular person to be frisked is armed. 444 U. S. at 93-94. *Ybarra* is quite clear that the officer's

---

[10] The record does not reflect how many guns the police informant observed in the possession of the game room's patrons, how he came to observe those weapons, whether those weapons were lawfully or unlawfully possessed, or whether the patrons he saw with firearms were regular customers of the game room. Nor does the record reflect that the informant observed firearms during each of his visits to the establishment.

reasonable belief or suspicion must be "directed at the person to be frisked." *Id.* at 94. Here, the government has offered no facts justifying a conclusion that these officers reasonably suspected that any particular patron -- much less defendant Glenn -- was presently in possession of a weapon when they commenced their pre-planned frisk of everyone in the game room. The officers' "generalized" belief that some of the patrons whom they had targeted for a systematic patdown might possibly have a weapon was insufficient to justify a "cursory" frisk of everyone present. *Id.* at 93-94.

When the police encountered defendant Glenn upon their entry into the game room he immediately complied with their commands to get on the ground. There has been no testimony that the officers recognized Glenn as a person who was known to carry firearms or who had a history of violence. Nothing about his behavior that evening was threatening or suggested that he might be armed and dangerous. Glenn was simply one of some 40 to 50 individuals that the officers had determined to seize and frisk before they ever entered the premises. *Ybarra* is quite clear that such unparticularized, non-specific, and cursory patdown searches of everyone present at the time a premises search warrant is being executed

is constitutionally impermissible. Of course, where officers executing a warrant encounter an individual whom they reasonably suspect to be armed and dangerous, a protective frisk of that person is entirely justified. *See, e.g., United States v. Bonds*, 829 F.2d 1072 (11th Cir. 1987) (officers executing search warrant for drugs at an apartment were entitled to frisk an individual who unexpectedly appeared at the door, but only because they recognized him as the suspected drug supplier of the apartment's occupants and had reason to believe that he was a dangerous character who "habitually carried a gun"). But the specificity of the facts in *Bonds* that justified the officers' belief that Bonds was armed and dangerous is totally lacking as to defendant Glenn. This case is much closer to the situation in *Ybarra*, where the officers had no "specific" grounds for suspecting that Ybarra was armed and dangerous. 444 U.S. at 93.

The Court is being quite charitable in even momentarily accepting the government's characterization of the officers' conduct as a legitimate protective frisk for weapons requiring only a "reasonable suspicion" standard. The record establishes that what was really going on here was a police roundup and shakedown of a large number of citizens in order to

conduct an *evidentiary* search for narcotics, weapons, and other contraband. The police sought a warrant for the purported reason of searching for the "distilled spirits" known to be in the possession of the game room's proprietor.[11] It is very likely that this evidence could have just as easily been recovered at 10:00 a.m., when the game room was empty of customers, as at 10:00 p.m. on a Friday night, when the establishment was filled to capacity. (The government has not suggested otherwise.) The officers, however, clearly intended to exploit their authority to search the game room for distilled spirits as an opportunity to search as many of the establishment's clientele as possible on the hope of finding narcotics and guns in their possession. They timed their entry to accomplish just such an evidentiary objective. By choosing to execute the warrant when they knew the game room would be crowded with customers, the officers chose to manufacture the type of dangerous situation that they thought would justify a *Terry* frisk of everyone

---

[11]   The officers had already made controlled purchases of liquor from the proprietor on four separate occasions and therefore had a solid case for charging him with the misdemeanor offense of distributing distilled spirits without a license. Had the officers chosen to do so, they could have furnished this information to the State Revenue Commissioner, whose agents are authorized to conduct administrative searches of any business engaged in the "distribution, sale, storage, or possession of alcoholic beverages at anytime for the purpose of inspecting the premises and enforcing this title. . . ." O.C.G.A. § 3-2-32.

present.[12]  But even after the entry team encountered no resistance from the crowd of people present in the game room (who immediately submitted to officers' commands), the officers continued to execute their pre-arranged plan to search everybody in the establishment.  The officers admitted that they hoped and expected to find guns and contraband during these searches.[13]  (They came up empty-handed, except for the single .22 caliber pistol found on defendant Glenn, thus suggesting that

---

[12]  The Court certainly does not question the right of the police to take reasonable measures to protect themselves while executing a search warrant.  Even where officers lack a warrant, it is "unreasonable to require [them to] take unnecessary risks in the performance of their duties."  *Terry*, 392 U.S. at 23.  Indeed, the Court assumes that even officers engaged in executing a warrant that is later determined to be unconstitutional (including one as "plainly invalid" as this one) are entitled to take reasonable protective measures.  But officers should not expect to profit from evidence they acquire in violation of a patron's constitutional rights.  The deterrent purposes of the exclusionary rule are furthered by the suppression of evidence obtained during the execution of a "plainly invalid" warrant, particularly where the officers created their own safety concerns by throwing a dragnet over as many patrons as possible for the express purpose of checking them for contraband.

Nor does the Court mean to imply that in executing a search warrant police officers must select the time that poses the least security risks, for officers are generally free to choose the time most consistent with their resources and investigatory objectives.  But here the government does not argue that the officers selected a late Friday night to execute the search warrant as a necessary or appropriate means of finding the evidence they sought authority to search for ("distilled spirits") or due to some manpower concerns.  Their primary focus was a generalized search for *evidence*, not safety concerns or distilled spirits.

[13]  When asked what the warrant authorized him to search for, Lt. Waters stated: "Distilled spirits and possibly drugs, mostly distilled spirits.  I don't think we even put -- well, narcotics and firearms." (Tr. at 27.)  Similarly, when officer Nathan Waters was asked what he was looking for when conducting patdown searches of the patrons, he responded: "Any kind, anything, any narcotics and stuff like that." (Tr. at 52.)

their safety concerns may have been exaggerated.) It took them an hour to conduct these "frisks." The government readily concedes that there could have been no conceivable safety concerns in the minds of the officers toward the end of the patdown process. That process nevertheless continued, and the reason it continued is that the officers had yet to complete their shakedown of the patrons for evidence.

> Each patron who walked into the [What Game Room] on [February 20, 2009], was clothed with constitutional protection against an unreasonable search or an unreasonable seizure. That individualized protection was separate and distinct from the Fourth and Fourteenth Amendment protection possessed by the proprietor of the [establishment] . . . . Although the search warrant, issued upon probable cause, gave the officers authority to search the premises . . ., it gave them no authority whatever to invade the constitutional protections possessed individually by the [game room's] customers.

*Ybarra*, 444 U.S. at 91-92. Courts have routinely condemned such generalized roundups and searches of the patrons of a commercial establishment. *See, e.g., Swint v. City of Wadley*, 51 F.3d 988 (11th Cir. 1995) (Carnes, J.).[14] While the government has not argued the existence

---

[14] *Swint* involved a civil rights action brought by the proprietors and patrons of a nightclub raided by the police. After purchasing narcotics from patrons inside the club, some thirty to forty officers twice raided the club (without a warrant), proceeded to detain at gunpoint dozens of citizens for an hour and a half, searched a number of them, and searched the premises as well. The Court noted that the officers lacked even "arguable probable cause" to conduct such an extensive raid of the nightclub. "Probable cause to arrest one suspect, and even probable cause to

of probable cause in this case, it is clear that probable cause was required here before the officers could embark upon an hour-long search of the game room's patrons for evidence of wrongdoing -- which is really what the officers were about.

The Court does not doubt that some of the patrons of the What Game Room are unsavory characters who regularly engage in various forms of criminality and are well-deserving of law enforcement attention. (Nor does the Court doubt -- as the government has never contended otherwise -- that the police had no reason to suspect wrongdoing on the part of many of the other patrons of that establishment.)  The police, however, must respect the Constitution, which is meant to serve as a bulwark against overzealous officers who sometimes forget that each citizen is "clothed with constitutional protection," *Ybarra*, 444 U.S. at 91, against any infringement of their right to be free from "unreasonable searches and seizures."  U.S. CONST. amend. IV.   This constitutional provision is not trivial.   It stands at the very core of our nation's

---

believe that a number of other or unidentified people had sold drugs in the establishment in the past, did not give the officers *carte blanche* to seize everyone who happened to be in the Club when the two raids took place."  51 F.3d at 997. Under these circumstances, the court concluded that no reasonable officer "could have believed that probable cause existed to search the entire club and seize all of its occupants."  *Id*. at 998.

founding principles of guaranteed liberty for all citizens, and the framers of the Constitution insisted that this reasonableness standard be enshrined in a separate Bill of Rights. By imposing a such a standard, the Fourth Amendment strikes a balance between society's right to investigate and prosecute crime and each individual's liberty and privacy interests in his "person[], houses, papers, and effects." *Id.* The infringement of such interests must be reasonable -- a concept that has been interpreted as requiring probable cause for evidentiary searches and reasonable suspicion for protective searches. The Supreme Court has made clear that both standards demand a focused inquiry directed at the particular person to be searched or frisked. *Ybarra, 444* U.S. at 91, 94. General shakedowns of citizens -- even those who patronize shady bars, nightclubs, and game rooms -- *have never* been permitted under our Constitution. That is really what was going on here. The actions of these officers cannot be reconciled with the law's great traditions and respect for individual liberty. This small-potatoes gun possession charge, adopted by the federal authorities as part of their "Project Ceasefire" program, rests entirely upon evidence seized by state officers in clear violation of the defendant's constitutional rights.

## CONCLUSION

For the reasons the Court has stated, defendant's motion to suppress the firearms seized from his waistband and his post-arrest statements should be **GRANTED**.

**SO REPORTED AND RECOMMENDED** this  29th  day of July, 2009.

/s/ G.R. SMITH
**UNITED STATES MAGISTRATE JUDGE**
**SOUTHERN DISTRICT OF GEORGIA**